**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1.  ALEASIA F. PULLUM,                               )<br>                                                                    )<br>            **Plaintiff,**                                      )<br>                                                                    )         Case No. 16-cv-716-GKF-PJC<br>v.                                                                )<br>                                                                    )<br>1.  CHECK-6 TRAINING SYSTEMS, INC., a       )<br>Foreign for Profit Business Corporation,       )         *Jury Trial Demanded*<br>                                                                    )<br>            **Defendants.**                                 )         *Attorney Lien Claimed* | |

## COMPLAINT

**COMES NOW** Aleasia F. Pullum, Plaintiff in the above-entitled action, by and through her attorneys, David R. Keesling and Timothy S. Kittle, of the law firm, KEESLING LAW GROUP, PLLC, and for her causes of action alleges as follows:

### JURISDICTION, VENUE, PARTIES

1. Jurisdiction in this matter is based upon the existence of a federal question under 28 U.S.C. § 1331 (2016) and 28 U.S.C. § 1343(a)(4) (2016), pursuant to claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. (2016) and 42 U.S.C. § 1981 (2016).

2. Venue is proper in the Northern District of Oklahoma under 28 U.S.C. § 1331(b) (2016) as Defendant's corporate headquarters are located in the City of Tulsa, Oklahoma.  *See* https://www.checksix.com/contact-us/.

3. Further, per its listing with the Oklahoma Secretary of State, Defendant Check-6's registered agent is listed as having the same address as its corporate headquarters in Tulsa, Oklahoma.

4. Plaintiff Aleasia F. Pullum, at all times relevant to the claims alleged herein, was and is a citizen of the State of Texas.

5. Defendant Check-6 Training Systems, Inc. ("Check-6"), at all times relevant to the claims alleged herein, was and is a foreign for profit business corporation operating in and under the laws of the State of Oklahoma, was and is an employer affecting commerce with fifteen (15) or more employees, as defined under 42 U.S.C. § 2000e(b), and whose corporate headquarters are located at 201 South Denver Avenue, Suite 306, Tulsa, Oklahoma.

6. Due to the foregoing, this Court has jurisdiction over the parties and subject matter.

### STATEMENT OF THE FACTS

7. Plaintiff Aleasia F. Pullum incorporates paragraphs 1 through 6 as if fully set forth verbatim.

8. Plaintiff, at all times relevant to the claims alleged herein, was an employee of Defendant Check-6 within the meaning of 42 U.S.C. § 2000e(f), working in the position of "Senior Quality Assurance Analyst."

9. Pertaining to the allegation contained in the immediately preceding paragraph, despite Defendant's continuous classification of Plaintiff as an "independent contractor," Plaintiff was determined to be an employee of Defendant Check-6 (not an independent contractor), as articulated in a letter to Plaintiff from the Internal Revenue Service ("Letter 4991"), dated August 30, 2016.

10. At all times relevant to the claims alleged herein, Plaintiff was a member of a federally-recognized protected class, in that she is an American of African descent.

11. Plaintiff was well-qualified for the position she held with Defendant Check-6, in that Plaintiff had the following degrees:

    a. B.B.A., Management, University of Oklahoma;

    b. M.B.A., Business Administration and Commerce, University of Phoenix;

    c. Doctoral Candidate, Business Administration.

12. Additionally, Plaintiff had substantial previous experience pertaining to the knowledge and skills required for the "Senior Quality Assurance Analyst Position" she held with Defendant Check-6.

13. Plaintiff commenced her employment with Defendant Check-6 on or about February 18, 2014, pursuant to a Letter and accompanying "Vendor Services Agreement," which were executed on February 7, 2014 by Plaintiff and Robert Luthy, Chief Operating Officer for Defendant Check-6.

14. Per the terms of the documents described in Paragraph 13 above, Plaintiff's employment extended until its expiration date of July 23, 2014, "unless terminated by either party with 30 days' notice."

15. Further, under the terms of those same documents, at the end of six months Plaintiff would be considered for a position as a "W-2 employee with Check-6."

16. Additionally, Plaintiff was verbally assured by Check-6 management personnel that all contractors hired by Check-6 were converted to full-time, regular employees ("W-2 employees") after their first six months of employment.

17. However, Plaintiff was not converted to a regular, full-time employee at the end of the agreement described above (July 23, 2014) or the passage of six months.

18. At the end of six months, Plaintiff approached Check-6 General Manager, Joseph Krasinski, and Assistant General Manager, Jason McAlister, to inquire about Plaintiff's conversion to full-time, regular employee.

19. Krasinski and McAlister advised that Plaintiff could not be converted at that time due to company financial issues.

20. However, during that time period, a similarly situated white female, hired around the same time as Plaintiff, was converted to full-time, regular employee.

21. Check-6 continued to maintain an employment relationship with Plaintiff after the expiration date stated on the agreement described in Paragraphs 13 and 14 above.

22. In November, 2014, Plaintiff again approached Joseph Kasinski and Jason McAlister about being converted to a full-time, regular employee.

23. In response, Kasinski and McAlister advised Plaintiff that such conversion was not possible at that time, due to pending litigation that affected Plaintiff's position.

24. However, Plaintiff was again presented with a written agreement to extend her employment, as articulated below.

25. On November 21, 2014, in a letter dated November 20, 2014, Plaintiff and Jason McAlister (named as "Chief Operating Officer) executed another agreement regarding Plaintiff's employment with Defendant Check-6 as a "Senior Quality Assurance Lead."

26. The new agreement described immediately above in Paragraph 25, similar to the agreement executed on February 7, 2014, contained the following language /terms:

    a. An end date of May 16, 2015 "unless terminated by either party with 30 days' notice;"

  b. A performance evaluation at the end of six months "with the potential to become a W-2 employee with Check-6;"

  c. An affirmation of Plaintiff's performance: "I believe that you are a critical part of [Check-6's] *rapid growth*." (Emphasis added).

27. Additionally, at a meeting attended by Plaintiff's husband regarding this new agreement, Plaintiff was assured that upon the completion of the litigation, Plaintiff would be converted to a full-time, regular employee, with all benefits pertaining thereto given application retroactive to July, 2014.

28. At this same meeting, Plaintiff was also advised that Defendant Check-6 had plans to promote Plaintiff to Quality Assurance *Manager* over an anticipated new Quality Assurance team.

29. Further, Plaintiff was informed that Check-6 anticipated that the litigation would resolve by Spring, 2015

30. Over the following twelve months, while employed at and by Defendant Check-6, Plaintiff endured or observed the following conduct that served to demean her race:

  a. Plaintiff was sent to discuss an issue with a summer intern, who was also African-American, because Check-6 management believed that Plaintiff could "relate better" to the intern solely because of their shared racial ancestry;

  b. Plaintiff saw two eminently qualified African-American female interviewees disqualified for a position that was given to a lesser qualified white male, even after one of the African-American females stated she would accept a diminished annual salary of $65,000.00;

      c.      Plaintiff saw that same position on her QA team (available after the white male hired to it failed) was offered to a female of Indian descent for $80,000.00, which was more than was offered to the African-American female described above in Paragraph 30.b, and (additionally) though a qualified African-American male was also an applicant;

      d.      Plaintiff was repeatedly subjected to racially offensive comments from a co-employee, Marissa McAlister, including a question to Plaintiff regarding the truth of a statement that black people have tails.

31. In June, 2015, Plaintiff approached Jason McAlister and inquired of the status of the litigation that allegedly precluded Plaintiff's conversion to full-time, regular employee.

32. In response, Jason McAlister advised that the litigation resolved in May, 2015.

33. After expressing her surprise that she was not advised of this fact, Plaintiff asked again about having her employment converted, as she had previously been assured (as described above).

34. Joseph Krasinski, as well as Jason McAlister, advised Plaintiff that due to continuing financial problems at Check-6, *no one* would be converted from contract employee to full-time, regular employee in 2014 or 2015.

35. In October, 2015, Plaintiff complained to her immediate manager, Adam Kieda, Jason McAlister, and Joseph Krasinski about issues she was having with Marissa McAlister, including Marissa's racially offensive comment, i.e., black people have tails.

36. This led to an investigation by Check-6's Human Resources Manager, Shannan Hurst, who was based at corporate headquarters in Tulsa.

37. Hurst went to Fort Worth to undertake her investigation.

38. Hurst emailed the results of that investigation in an email to Plaintiff, stating that no action would be taken as there were allegedly no witnesses to Marissa McAlister's comment.

39. In that same email, Hurst reiterated Jason McAlister's averment earlier in the year that Check-6 would not be converting any contractors to full-time, regular employees due to financial problems.

40. At a meeting held on December 11, 2015, Marissa McAlister, in the presence of several other employees, denied making racially offensive comments, and yelled an accusation that it was Plaintiff who called Shannan Hurst to Fort Worth to investigate Marissa McAlister.

41. Additionally, at this same meeting, Joseph Krasinski changed Plaintiff's working conditions, instructing Plaintiff that she could no longer work from home, but would have to come to the Check-6 site Tuesday through Thursday.

42. On the following day, December 12, 2015, a company year-end meeting was held.

43. At that meeting, it was announced, *contrary to what Plaintiff had repeatedly been advised*, that a white male contractor had been converted to full-time regular employee.

44. On December 15, 2015, another of Plaintiff's agreed upon working conditions was changed, as Plaintiff was advised (by her new supervisor Kristi Craig) that she would not be paid for personal time off ("PTO") that Plaintiff had planned to take around the holidays, beginning December 18, 2015.

45. In response, Plaintiff scheduled a meeting for December 17, 2015 with Joseph Krasinski, to discuss this latest event.

46. However, Krasinksi was a no-show to the meeting.

47. On December 18, 2015, in response to issues she had encountered at Check-6, Plaintiff went to the Dallas office of the Equal Opportunity Commission ("EEOC") and filed a Charge of Discrimination.

48. On Saturday, December 19, 2015, Plaintiff received letter from Defendant Check-6, via certified mail, signed by Joseph Krasinski, advising that "Check-6 Training Systems, Inc., is hereby exercising 30 days' notice of termination of your independent contractor agreement," effective immediately.

49. No reason for the termination was provided in said letter.

50. Upon receipt of the termination letter, Plaintiff called her EEOC investigator, Nasser Duncan, and advised that since the filing of her Charge of Discrimination she had been discharged from her position with Defendant Check-6.

51. Consequently, within weeks of Plaintiff complaining about offensive racial incidents in her workplace, Plaintiff's terms and conditions of employment were detrimentally affected, including discharge from her employment.

52. On September 12, 2016, EEOC issued a "Dismissal and Notice of Rights," or "Right to Sue Letter."

53. Consequently, pertaining to all claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, this action is timely filed, in that it has been filed within ninety (90) days of the issuance of the "Right to Sue Letter."

54. The claims under 42 U.S.C. § 1981 are not similarly subject to EEOC administrative exhaustion or the 90-day time limit for filing.

**FIRST CAUSE OF ACTION**
**UNLAWFUL DISCRIMINATION IN EMPLOYMENT**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000E** *et seq.*

55. Plaintiff Aleasia F. Pullum incorporates paragraphs 1 through 54 as if fully set forth verbatim.

56. Plaintiff was a member of a protected class under the Act, specifically, a person of African-American descent.

57. Plaintiff was intentionally denied a position as a full-time, regular employee with Defendant.

58. Plaintiff was qualified for the position that was denied to her by Defendant.

59. Others not within Plaintiff's class and who were similarly or less qualified than Plaintiff were given the full-time, regular employee position that Defendant denied to Plaintiff.

60. Plaintiff's race was a motivating factor in Defendant's decision to not give the full-time, regular employee position to Plaintiff.

61. As a result of the actions constituting unlawful discrimination because of Plaintiff's race, Plaintiff's rights were violated, causing her injury.

**SECOND CAUSE OF ACTION**
**UNLAWFUL DISCRIMINATION IN EMPLOYMENT**
**42 U.S.C. § 1981**

62. Plaintiff Aleasia F. Pullum incorporates paragraphs 1 through 61 as if fully set forth verbatim.

63. Plaintiff was a member of a protected class under the Act, specifically, a person of African-American descent.

64. Plaintiff was intentionally denied a position as a full-time, regular employee with Defendant.

65. Plaintiff was qualified for the position that was denied to her by Defendant.

66. Others not within Plaintiff's class and who were similarly or less qualified than Plaintiff were given the full-time, regular employee position that Defendant denied to Plaintiff.

67. Plaintiff's race was a motivating factor in Defendant's decision to not give the full-time, regular employee position to Plaintiff.

68. As a result of the actions constituting unlawful discrimination because of Plaintiff's race, Plaintiff's rights were violated, causing her injury.

**THIRD CAUSE OF ACTION**
**UNLAWFUL RETALIATION**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000E-3(a)**

69. Plaintiff Aleasia F. Pullum incorporates paragraphs 1 through 68 as if fully set forth verbatim.

70. Plaintiff was a member of a protected class under the Act, specifically, a person of African-American descent.

71. Plaintiff engaged in a protected activity by complaining about offensive comments in her workplace that were demeaning to people of African descent.

72. In response to Plaintiff's complaints, Plaintiff was subjected to a retaliatory and materially adverse employment action, i.e., Plaintiff's previous ability to work from home was withdrawn.

73. In response to Plaintiff's complaints, Plaintiff was subjected to a retaliatory and materially adverse employment action, i.e., Plaintiff's previously approved paid time off was withdrawn.

74. In response to Plaintiff's complaints, Plaintiff was subjected to a retaliatory and materially adverse employment action, i.e., Plaintiff's employment with Defendant was terminated.

75. Defendant's actions as perpetrated against Plaintiff would tend to dissuade a reasonable employee from making or supporting a charge of discrimination in the workplace.

76. As a result of the actions constituting retaliation against Plaintiff, the rights of were violated, causing Plaintiff injury.

## FOURTH CAUSE OF ACTION
## UNLAWFUL RETALIATION
## 42 U.S.C. § 1981

77. Plaintiff Aleasia F. Pullum incorporates paragraphs 1 through 76 as if fully set forth verbatim.

78. Plaintiff was a member of a protected class under the Act, specifically, a person of African-American descent.

79. Plaintiff engaged in a protected activity by complaining about offensive comments in her workplace that were demeaning to people of African descent.

80. In response to Plaintiff's complaints, Plaintiff was subjected to a retaliatory and materially adverse employment action, i.e., Plaintiff's previous ability to work from home was withdrawn.

81. In response to Plaintiff's complaints, Plaintiff was subjected to a retaliatory and materially adverse employment action, i.e., Plaintiff's previously approved paid time off was withdrawn.

82.     In response to Plaintiff's complaints, Plaintiff was subjected to a retaliatory and materially adverse employment action, i.e., Plaintiff's employment with Defendant was terminated.

83.     Defendant's actions as perpetrated against Plaintiff would tend to dissuade a reasonable employee from making or supporting a charge of discrimination in the workplace.

84.     As a result of the actions constituting retaliation against Plaintiff, the rights of were violated, causing Plaintiff injury.

### PUNITIVE AND EXEMPLARY DAMAGES

85.     Plaintiff Aleasia F. Pullum incorporates paragraphs 1 through 84 as if fully set forth verbatim.

86.     The acts and omissions by Defendant Check-6, as set forth in the preceding paragraphs, demonstrate that Defendant was engaged in conduct evincing malice or reckless indifference to Plaintiff's rights.

87.     As a direct result of Defendant's malice and /or reckless disregard for Plaintiff's rights, Plaintiff is entitled to exemplary and punitive damages in an amount to be determined by a jury commensurate with the financial resources available to Defendant, subject to applicable statutory caps, and sufficient to deter others similarly situated from like behavior.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Aleasia F. Pullum prays this Court to grant to her the following relief:

A.      Judgment against Defendant in excess of Seventy-Five Thousand Dollars ($75,000.00);

B.      Punitive damages against Defendant to the extent permitted by law;

C. Order Defendant to pay the attorney fees, costs, and accruing interest incurred by Plaintiff in prosecuting this matter;

D. Any other such further relief this Court deems just and proper.

Respectfully submitted,

**KEESLING LAW GROUP, PLLC**

/s/ David R. Keesling
David R. Keesling, OBA No. 17881
Timothy S. Kittle, OBA No. 21979
11114 South Yale Avenue, Suite B
Tulsa, Oklahoma 74137
(918) 924-5101 – Telephone
(918) 512-4888 – Facsimile
David@KLGattorneys.com
Tim@KLGattorneys.com
*Attorneys for Plaintiff:*
*Aleasia F. Pullum*