UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ALEASIA F. PULLUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:16-cv-00716-GKF-FHM |
| (1) CHECK-6 TRAINING SYSTEMS, | ) | |
| INC., a Foreign for Profit Business | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT CHECK-6 TRAINING SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Respectfully submitted,

Denelda Richardson, OBA No. 20103
Michael Robertson, OBA No. 32551
Jessica Fu, OBA No. 30560
**RHODES HIERONYMUS JONES**
    **TUCKER & GABLE, PLLC**
P.O. Box 21100
Tulsa, Oklahoma 74121
(918) 582-1173 – Telephone
(918) 592-3390 – Facsimile
drichardson@rhodesokla.com
mrobertson@rhodesokla.com
jfu@rhodesokla.com
*Attorneys for Defendant, Check-6 Training Systems, Inc.*

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  UNDISPUTED MATERIAL FACTS .................................................................2

    a.  Plaintiff's History With Check-6 .........................................................2

    b.  Plaintiff's Comparators ........................................................................5

    c.  Summer Intern ......................................................................................6

    d.  Hiring Disparities ................................................................................7

    e.  Offensive Comments ...........................................................................8

    f.  Check-6 Reorganization and Plaintiff's Deficiencies.......................12

    g.  Subsequent Cutbacks .........................................................................15

III.  ARGUMENTS AND AUTHORITIES .............................................................16

    A.  SUMMARY JUDGMENT STANDARD ..............................................................16

    B.  TITLE VII AND SECTION 1981.....................................................................17

    C.  DISCRIMINATION UNDER TITLE VII OR SECTION 1981.............................18

        1.  Plaintiff Cannot Establish a Prima Facie Case of Discrimination .................18

        2.  Defendant Had a Legitimate, Nondiscriminatory Reason for Not Converting Plaintiff .......................................................................23

    D.  RETALIATION UNDER TITLE VII OR SECTION 1981 ..................................24

        1.  Working from Home.............................................................................25

        2.  Withdrawn PTO...................................................................................27

        3.  Termination of Plaintiff's Contract ...................................................27

IV.  CONCLUSION ..................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998).................................... 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................... 16, 17

*Aramburu v. Boeing Co.*, 112 F.3d 1398 (10th Cir. 1997) ........................................... 20

*Baca v. Sklar*, 398 F.3d 1210 (10th Cir. 2005) .................................................. 17

*Barlo v. C.R. Eng., Inc.*, 703 F.3d 497 (10th Cir. 2012).................................... 18

*Carney v. City & County of Denver*, 534 F.3d 1269 (10th Cir. 2008)......................... 18

*Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122 (8th Cir. 2000) ................... 23

*Cuenca v. Univ. of Kan.*, 101 F. App'x 782 (10th Cir. 2004)......................... 22

*Exum v. U.S. Olympic Comm.*, 389 F.3d 1130 (10th Cir. 2004).................................... 18

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir. 2000)................... 18

*Lobato v. N.M. Env't Dep't*, 733 F.3d 1283 (10th Cir. 2013)........................ 25

*McCrary v. Aurora Pub. Schs.*, 57 F. App'x 362 (10th Cir. 2003) ............................... 22

*McGowan v. City of Eufala*, 472 F.3d 736 (10th Cir. 2006)........................... 20

*Mesa Oil, Inc. v. Ins. Co. of N. Am.*, 123 F.3d 1333 (10th Cir. 1997) ......................... 17

*Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213 (10th Cir. 2017) ............ 25

*Proctor v. United Parcel Serv.*, 502 F.3d 1200 (10th Cir. 2007)................................ 25

*Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995)................................... 18

*Salemi v. Colo. Pub. Emples. Ret. Ass'n*,
    2018 U.S. App. LEXIS 22928 (10th Cir. Aug. 17, 2018)..................................... 25

**Statutes**

42 U.S.C. § 1981 ........................................................................................................ 17

42 U.S.C. §§ 2000e, *et seq.* ...................................................................................... 17

**Rules**

FED. R. CIV. P. 56(a) ................................................................................................ 16

FED. R. CIV. P. 56(c) ................................................................................................ 17

## I. INTRODUCTION

Defendant, Check-6 Training Systems, LLC ("Check-6"), hired Plaintiff, Aleasia Pullum ("Plaintiff") as a quality assurance analyst in February 2014. Plaintiff was classified as an independent contractor with the opportunity to be converted to employee. Unfortunately, a series of difficult financial and legal circumstances resulted in Check-6 being unable to convert Plaintiff. Check-6 was, however, happy with Plaintiff's work and rewarded her by giving her raises and other benefits typically reserved for employees. At the time Plaintiff's final contract was terminated, she was one of the highest paid individuals at Check-6 Training Systems and had the opportunity to earn bonuses and paid time off ("PTO").

In October 2015, one of Plaintiff's coworkers sought assistance from her manager regarding Plaintiff's terse and impatient communication style. In the conversation with Plaintiff that followed, Plaintiff outlined to her manager her belief that several of her coworkers harbored racial bias and were working together in an effort to make Plaintiff quit. Plaintiff had just begun to work with these coworkers after Check-6 reorganized her department. Plaintiff initially welcomed and praised the additional help, and her allegations regarding bias and targeting came just days after the new analyst uncovered deficiencies in Plaintiff's work. A month later, Plaintiff reported that this same coworker had made inflammatory, race-based comments the year before. Check-6 immediately investigated these comments but could not substantiate the allegations.

By mid-December 2015, Plaintiff had begun missing meetings and questioning Check-6's business decisions. She told the General Manager she could not work in the new organizational structure. After assessing the significant cost of Plaintiff's contract, her work deficiencies, and her unwillingness to work in the new system, Check-6 decided it was in its best interest to part ways. Plaintiff then initiated this lawsuit alleging race discrimination and retaliation.

## II. UNDISPUTED MATERIAL FACTS

1.      Check-6 is a subsidiary of Check-6 International, Inc. [Declaration of McAlister, Exhibit 1, ¶ 2.] Check-6 provides operational excellence and leadership coaching for its clients, which are mostly businesses in the oil and gas production industry. [*Id.*]

2.      Plaintiff was hired as a Senior Quality Assurance Analyst on the WCVI project, which is one of Check-6's three service divisions. While there were quality assurance ("QA") analysts in the other two service divisions, the QA departments of each division operated separately. [Exhibit 1, ¶ 3.]

### a.  Plaintiff's History With Check-6

3.      Check-6 hired Plaintiff on February 5, 2014 as an independent contractor for a six (6) month term. [February 2014 Contract, Exhibit 2.] Plaintiff's hourly rate was $40.86 per hour. The contract, signed on February 20, 2014, included the "potential" to become an employee after six months. [Exhibit 2.]

4.      On May 29, 2014, Check-6 laid off approximately eight (8) employees in the QA and Development departments in response to a report on the company's financial outlook. [Exhibit 1, ¶ 4.] As a result, Check-6 placed a hiring freeze on both QA and Development, with no new hires or conversions from contractor to employee approved for six (6) months. [*Id*. ¶ 5.]

5.      Following the layoffs, Plaintiff was the only remaining member of QA in the WCVI division. [Exhibit 1, ¶ 4.] Plaintiff began reporting to Adam Kieda, who was the WCVI Program Manager at the time. [Plaintiff's Deposition, Exhibit 3, 48:18-49:1.]

6.      Check-6 was happy with Plaintiff's performance. However, Plaintiff was not made an employee at the expiration of her contract because QA and Development remained subject to a hiring freeze. [Exhibit 1, ¶ 6.]

7.     On August 6, 2014, prior to the expiration of Plaintiff's six month contract, Plaintiff signed a four (4) month contract extension. [August 2014 Contract, Exhibit 4.] The contract extension included a promotion to Senior QA Lead and a $2.14 per hour raise. [*Id*.]

8.     Plaintiff's August contract extension was set to expire in November 2014. [*Id.*] At that time, the hiring freeze for QA and Development had been lifted. However, Check-6 had been sued by a former QA employee. At the advice of counsel, Check-6 made a business decision not to hire or convert anyone in that department until the litigation concluded. [Exhibit 1, ¶ 7.]

9.     Check-6 informed Plaintiff of the reason she could not be converted to employee. Plaintiff was advised that the litigation would likely be concluded by the time her new contract expired, and her employment status could be revisited at that time. [Exhibit 1, ¶ 8; Exhibit 3, 50:17-52:14.]

10.    On November 21, 2014, Plaintiff signed a new six (6) month contract. Plaintiff was once again retained as a Senior QA Lead. However, instead of being paid an hourly rate, the new contract provided Plaintiff with a monthly retainer of $8,667.00. [November 2014 Contract, Exhibit 5.] The retainer was the equivalent of $104,004 per year, a raise of approximately 15%. Plaintiff's new contract also granted her bonuses and PTO like an employee. [*Id.*; Exhibit 3, 49:23-50:13.]

11.    Plaintiff was the only contractor and/or employee to receive a raise in 2014. [Exhibit 1, ¶ 9.]

12.    Plaintiff's original February 2014 contract with Check-6, the August 2014 contract extension, and the November 2014 retainer contract all included the same boilerplate language indicating that Plaintiff's performance would be evaluated at the end of the six months "with the potential to be become [sic] a W-2 employee with Check-6." [Exhibit 2; Exhibit 4; Exhibit 5.] The

contracts further state, "I hope you accept our offer to become a vital part of the Check-6 team. I believe that you are a critical part of our rapid growth." [*Id.*.]

13.    In 2015, Check-6 began facing financial difficulties as a result of the falling price of oil. Specifically, between November 21, 2014 and January 2, 2015, the price of oil per barrel fell from $76.63 to $52.59. The average price of oil in 2015 was $49.10. The day Plaintiff's contract was finally terminated, it was $36.03 per barrel. [Historical Oil Prices, Exhibit 6.]

14.    As a result of the decreasing price of oil, Check-6 once again implemented hiring practices that prevented contractors from converting to employees and limited hiring across the board. [Exhibit 1, ¶ 10.] During 2015, Check-6 did not convert any independent contractors to employee status in any department. [*Id.* at ¶ 11.]

15.    In May 2015, the litigation that prevented Plaintiff's conversion to employee concluded. [*Id.* at ¶ 12; Exhibit 3, 50:23-52:14, 76:19-77:11.] Although Check-6 had intended to convert Plaintiff at that time, the company's financial situation once again prevented it from doing so. [Exhibit 1, ¶ 12.]

16.    Plaintiff's last contract with Check-6 officially expired on May 16, 2015. [Exhibit 5.] However, Check-6 continued to honor the terms of the contract, and Plaintiff continued to work and receive her monthly retainer until her contract was terminated on December 17, 2015. [Exhibit 1, ¶ 13.]

17.    Had Plaintiff been converted to employee, she would not have been entitled to an additional raise. [Exhibit 1, ¶ 14.] At most, Plaintiff's conversion would have provided her with the opportunity to access the Company's health insurance and 401(k) plans. [*Id.*]

18.    The 401(k) plan offered employer matching of up to 3% of the holder's salary. [*Id.*] Plaintiff testified that she did not need the Company's health insurance as she was covered under her husband's plan. [Exhibit 3, 45:23-46:10.]

19.    QA analysists, like Plaintiff, typically rely on contract work. [Exhibit 3, 26:23:-27:4.] Plaintiff testified that "six months is pretty much the standard or a year" for quality assurance analysts contracts. [*Id.* at 38:19-39:4.] Plaintiff identified only one QA position, either before or after her time at Check-6, wherein she was an employee of the company for which she worked and not a contract worker. [*Id.* at 24:16-39:7.]

**b.  Plaintiff's Comparators**

20.    On July 30, 2014, a white female was converted from independent contractor to employee at the expiration of her initial six month contract. [Exhibit 1, ¶ 15; Dkt No. 2, ¶ 20.] Although this individual was hired around the same time as Plaintiff, she was a Business Analyst and part of the Architecture department. That department was not subject to the hiring freeze that affected the QA and Development departments. [Exhibit 1, ¶ 16.]

21.    Despite being converted to employee, the Business Analyst did not receive a raise in pay in 2014 or 2015. [*Id.* at ¶ 17.]

22.    On December 1, 2014, a Senior Developer was converted from independent contractor to employee. This individual is a white male and was hired around the same time as Plaintiff. [Exhibit 1, ¶ 18; Dkt No. 2, ¶ 43.]  At the time of the Senior Developer's conversion, the hiring freeze that had impacted the QA and Development departments was no longer in place.  The Development department was not affected by the then-pending litigation.

23.    Prior to his conversion to employee, the Senior Developer signed a short term contract extension in July 2014, just as Plaintiff did. [Exhibit 1, ¶ 19.] Like Plaintiff, the Senior

Developer could not be converted at the time his initial contract expired because of the hiring freeze on the QA and Development departments.

24.     Unlike Plaintiff, the Senior Developer was not given a raise at the time he signed his contract extension. Nor was he given a raise in pay when he was converted to employee in December 2014 or at any subsequent time in 2015. [Exhibit 1, ¶ 20.]

25.     Check-6 did not guarantee that anyone, including Plaintiff, would be converted from independent contractor to employee after 6 months. [Exhibit 1, ¶ 21; Exhibits 2, 4-5.]

26.     During Plaintiff's tenure with the Company, at least five (5) workers remained independent contractors in excess of 6 months. [Exhibit 1, ¶ 22.]

- A white male software developer was classified as an independent contractor from 2011 to present;

- A white male courseware developer was classified as an independent contractor from September 2014 until March 2016;

- A white male in customer support was classified as an independent contractor from December 2014 until March 2016;

- A white male in product support was classified as an independent contractor from May 2015 until March 2016; and

- A non-white male software architect was classified as an independent contractor from June 2015 until June 2016.

c. **Summer Intern**

27.     During the summer of 2013, Check-6 employed six interns. Only one of those interns, an African American female, was asked to return to Check-6 in the summer of 2014. [Exhibit 1, ¶ 23.]  This intern reported directly to Plaintiff and was co-located with Plaintiff. [Exhibit 1, ¶ 24;

Exhibit 3, 114:1-5; 115:14-16.]

28.    An issue with regard to the intern's personal hygiene arose, and Plaintiff was asked to counsel the intern. Plaintiff was the person who raised the complaints, and Plaintiff's manager told her she was the "best person" to handle the situation. [Exhibit 1, ¶ 25; Exhibit 3, 114:8-16.] Plaintiff testified that she was successful in counseling the intern and felt like it was an opportunity to mentor her and provide guidance. [Exhibit 3, 116:1-15.]

29.    Plaintiff assumed the reason she was given this task was because of her race, but she admits she has no evidence that it was. [Exhibit 3, 114:8-116:25.] Plaintiff never reported to anyone at Check-6 that she believed she had been asked to counsel the intern because of her race. [Exhibit 1, ¶ 40; Exhibit 3, 116:22-25.]

**d.  Hiring Disparities**

30.    Sometime in late 2014 or early 2015, Check-6 began the process of hiring a contractor for a QA position in the WCVI division. [Exhibit 1, ¶ 26.]  As the only member of the QA team, Plaintiff was a significant part of the hiring process, though she did not have the final say over who was hired. [*Id.*]

31.    The hiring process for the QA position began with Plaintiff reviewing all of the resumes. Plaintiff then chose candidates for telephone interviews, which Plaintiff also conducted. Finally, based on their resumes and telephone interviews, Plaintiff chose the candidates to be brought in for in-person interviews. Plaintiff's manager and another employee interviewed those candidates in-person along with Plaintiff. [Exhibit 3, 58:25-60:21.]

32.    The first round of candidates included two extremely qualified African-American females. [Exhibit 3, 61:20-64:6; Dkt No. 2, ¶ 30.] However, after a review of its finances, Check-6 decided to downgrade the QA position and offer a smaller salary. [Exhibit 1, ¶ 27; Exhibit 3,

62:10-64:6.] This change required the hiring process start over with HR collecting new resumes for the downgraded position. [*Id*.] Candidates for the junior level position would have less technical experience, which would cost the Company less. [Exhibit 1, ¶ 27; Exhibit 3, 65:1-18.]

33.   Throughout the hiring process for the QA position, Plaintiff had the discretion in choosing the candidates who were considered. She was not pressured by anyone at Check-6 to alter her recommendations in any way. [Exhibit 1, ¶ 28; Exhibit 3, 58:25-60:21; 67:24-68:8.]

34.   The candidate ultimately hired for the QA position was a white male. He was offered a salary of $59,280.00. [Exhibit 1, ¶ 29.]  This is significantly less than the position was originally intended to pay and less than the $65,000.00 one of the African-American candidates allegedly stated she would accept. [Exhibit 3, 62:10-63:4; Dkt No. 2, ¶ 30.]

35.   The candidate hired for the QA position began in February 2014. He ultimately did work out and was terminated at Plaintiff's recommendation, effective June 30, 2015. [Exhibit 1, ¶ 30; Exhibit 3, 65:1-18.]

36.   When looking for the candidate's replacement, Check-6 determined that it would be better for the Company to pay more for a contractor with better experience. As a result, the position was offered at a higher salary to a qualified, female candidate of Indian descent. This candidate turned down the offer. [Exhibit 1, ¶ 31; Exhibit 3, 68:12-70:9.]

37.   Plaintiff continued to look for a replacement for the terminated QA candidate until she was advised on August 30, 2015 that, due to financial concerns, the QA position would not be filled. [Aug. 30 Email, Exhibit 7; Exhibit 3, 70:17-24.]

e.   **Offensive Comments**

38.   In approximately March 2014, an employee named Ryan Cagle (f/k/a Ryan Hestilow) was hired as an executive assistant. [Exhibit 1, ¶ 32.] Around the time Ms. Cagle joined the

company, she sent an email to Plaintiff wherein she referred to Plaintiff as "ma'am." [April 15 Emails, Exhibit 8.] Ms. Cagle routinely used both "sir" and "ma'am" with all of her coworkers. [Exhibit 1, ¶ 33.] However, Ms. Cagle apologized to Plaintiff after Plaintiff told Ms. Cagle that "ma'am" made Plaintiff feel old. [Exhibit 8.]

39.   In late July/early August of 2015, Ms. Cagle was asked to take on the additional duties of project manager. [Exhibit 1, ¶ 34.]  As part of these new duties, Ms. Cagle was tasked with initiating and running "scrums," which are meetings using the Skype messenger application. [*Id.* at ¶ 35.]

40.   QA, including Plaintiff, was often a part of these scrums. [*Id.*] When Ms. Cagle attempted to initiate a scrum on October 9, 2015, Plaintiff was inadvertently left out. [Email with Skype text, Exhibit 9.] Such omissions can occur when a participant exits the messenger group instead of closing the application. [Nov. 30 Email, Exhibit 10 (showing Plaintiff being asked not to do this after a different meeting).] Plaintiff was added to the scrum by Ms. Cagle as soon as Ms. Cagle was made aware of the omission. [Exhibit 9.]

41.   In a private Skype message, Ms. Cagle apologized to Plaintiff for the error, writing that she did not realize that Plaintiff was not in the group until Plaintiff wrote to her. [Exhibit 9.] The following exchange occurred:

[10/9/2015 9:33:55 AM] Aleasia Pullum: are you doing the vicw scrum?
[10/9/2015 9:41:02 AM] Ryan "Squeeze" Cagle: Sorry ma'am, didn't realize you weren't in the group until you wrote me. I added you right after but it just rang and rang....
[10/9/2015 9:47:04 AM] Aleasia Pullum: no worries...mistakes happen...I would think otherwise if it was intentional...now that would be unprofessional and immature
[10/9/2015 9:53:23 AM] Ryan "Squeeze" Cagle: I just goofed. I was tied up on the phone with Mac while creating the group this morning and had to request Chappy & Grant because I didn't have their contact info. Lots of hassle this morning - trying to do 50 million things at one time. Sorry you felt you were being neglected. That was not my intention at all
[10/9/2015 9:54:11 AM] Aleasia Pullum: no worries because I didn't feel anything..its just a job

42.   Plaintiff's responses during the Skype exchange confused Ms. Cagle, who felt that the exchange was indicative of Plaintiff's terse and impatient manner with her. Ms. Cagle reported

her concerns about her communication with Plaintiff to Kristi Craig, the Technical Services Manager. [Documentation of Complaint, Exhibit 11.]

43.    On October 9, 2015, Ms. Craig approached Mr. Kieda, Plaintiff's manager. [*Id.*]  Mr. Kieda determined there might be a communication problem, so Mr. Kieda called Plaintiff to discuss the situation. [*Id.*; Exhibit 3, 89:11-90:25.] Plaintiff denied having a problem with Ms. Cagle. However, Plaintiff complained about Ms. Cagle's use of the word "ma'am," noting that she perceived a racial bias in Ms. Cagle's continued use of the term with her and that it was "catching on" with Ms. Craig. She also reported that she believed Ms. Cagle, Ms. Craig, and a third employee – Marissa McAlister – had formed a clique with the goal to make Plaintiff uncomfortable enough to quit. [Exhibit 11; Exhibit 1, ¶ 36.]  Mr. Kieda offered to facilitate a meeting with the group in order to resolve any issues that may be there. He also assured Plaintiff that her contract would not be affected by her report. [Exhibit 11.]

44.    In an email on October 9, 2015, Mr. Kieda assured Plaintiff that she was a valued part of the team and that his goal was to find a way to help everyone work together. [Oct. 9 Email, Exhibit 12.] Plaintiff's emails in response emphasize Ms. Cagle's alleged shortcomings. Specifically, Plaintiff noted that Ms. Cagle "has been from her first day, trying to cause trouble with" Plaintiff, characterizing her as that "one person who don't want to get along, establish a good working relationship or want you to succeed." [*Id.*]

45.    Joseph Krasinski, the General Manager, took over the investigation on or about October 9, 2015. [Exhibit 1, ¶ 37.]  On October 13, 2015, Mr. Krasinski and Jason McAlister, the Assistant General Manager, met with Plaintiff to discuss her claims of racial bias against Ms. Cagle, Ms. Craig, and Ms. McAlister. [Exhibit 1, ¶ 38; Exhibit 11.] The discussion again focused on Ms. Cagle's use of the word "ma'am" and Ms. Cagle's "tone." [*Id.*]

46.     Throughout the month of October 2015, Mr. Krasinski continued to attempt to resolve Plaintiff's claims of bias against Ms. Cagle, Ms. Craig, and Ms. McAlister. [Exhibit 11.]

47.     On or about November 17, 2015, Plaintiff reported to Mr. Krasinski and to the Company's HR representative for the first time that Ms. McAlister had made racially insensitive comments the year before. [Exhibit 11.] Specifically, Plaintiff reported that, in August 2014, Ms. McAlister had made inflammatory comments about rioters in Ferguson, Missouri and then, in December 2014, Ms. McAlister told Plaintiff that someone told her that black people had tails. [Exhibit 11.]

48.     Plaintiff did not report Ms. McAlister's statements at the time they took place, nor did Plaintiff report Ms. McAlister's statements during the first month of Check-6's investigation into her claims of racial bias. [Exhibit 11; Exhibit 1, ¶ 40.]

49.     Immediately following Plaintiff's disclosure on November 17, 2015, the Company's HR representative traveled from Tulsa to Fort Worth, where Plaintiff and the others were located, to investigate Plaintiff's allegations. [Exhibit 11; Exhibit 1, ¶ 41.] Although the HR representative interviewed all of the alleged participants and witnesses, the events as described by Plaintiff could not be corroborated. [Investigation Notes, Exhibit 13; HR Emails, Exhibit 14.] The investigation was concluded on November 23, 2015. [Investigation Report, Exhibit 15.]

50.     Other than Ms. Cagle's use of the word "ma'am" and Ms. McAlister's two alleged statements, Plaintiff never reported any other incidents of offensive comments. Plaintiff's written statement to HR on November 19, 2015 included only the two alleged statements in 2014. [HR Email, Exhibit 25 (requesting details of all incidents); Plaintiff's Statement, Exhibit 26.]

51.     At HR's recommendation, Mr. McAlister requested that no one in the Check-6 offices use the terms "sir" or "ma'am" in order to avoid giving others offense. [Exhibit 1, ¶ 43.]

**f.   Check-6 Reorganization and Plaintiff's Deficiencies**

52.    Sometime in September 2015, a lull in projects afforded Check-6 the opportunity to streamline many of its procedures. Previously, Plaintiff's QA at WCVI followed its own procedures with little to no oversight or guidance. In order to create consistency across Check-6, members of the QA department in a different division were moved to WCVI to implement the Company's best practices. [Exhibit 1, ¶¶ 44-45.]

53.    A new organizational chart and QA roles were implemented. Rather than continue to report to Mr. Kieda, who was not a part of the QA department, Plaintiff began reporting to Ms. Craig. In addition, Ms. McAlister, a QA analyst with the other division, began assisting Plaintiff with QA duties. [Exhibit 1, ¶ 46; Exhibit 3, 82:6-10.]

54.    On September 30, 2015, Ms. McAlister began QA testing a project with Plaintiff. [Oct. 7 Email Chain, Exhibit 16.]

55.    On October 7, 2015, Plaintiff sent an email thanking Ms. McAlister for her assistance on the QA testing. Plaintiff wrote that Ms. McAlister "performed at a high level and it is very much appreciated. Bravo!!" [*Id.*]

56.    Also on October 7, 2015, Ms. McAlister sent a private email to Ms. Craig outlining several deficiencies she noted in the WCVI QA procedures being used by Plaintiff. [Craig-McAlister Email, Exhibit 17.] Ms. Craig indicated these issues would be discussed with Mr. Kieda, the project manager. [*Id.*]

57.    Two days later, Plaintiff's scrum-related interaction with Ms. Cagle occurred over Skype messenger, and Plaintiff reported to her manager that Ms. Cagle, Ms. Craig, and Ms. McAlister had joined forces in an attempt to make Plaintiff quit. [Exhibit 11.]

58.   On October 15, 2015, Plaintiff emailed Ms. Craig that Ms. McAlister was deserving of a "bravo" at the next meeting for her work. Plaintiff wrote that Ms. McAlister "is awesome!! She is very detailed, analytical, smart, and has that eagle eye for testing. I really appreciate her willingness to help." [Oct. 15 Email, Exhibit 18.]

59.   On October 28, 2015, Mr. Kieda, Plaintiff's former manager, announced his resignation, effective October 30, 2015. [Oct. 28 Email, Exhibit 19.] Earlier in August, Plaintiff had asked Mr. Kieda if, because of the financial situation at the Company, she should be concerned about her position. Mr. Kieda advised that "everyone should have a plan B with the state of affairs these days, regardless of position. It's the smart thing to do with the current unpredictability . . . ." [Exhibit 7.]

60.   On November 3, 2015, Plaintiff emailed a consulting firm requesting assistance in finding a new job. [Nov. 3 Email, Exhibit 20.]

61.   On November 5, 2015, Ms. Craig, Plaintiff's new manager, scheduled a meeting for November 10, 2015 to discuss QA roles and responsibilities. [Jan. 2016 Email, Exhibit 21; *See also* Exhibit 11 (noting Nov. 16 meeting to discuss rejected meeting requests).] Plaintiff waited until the day of the scheduled meeting to decline the meeting request, stating that she was working from home. [*Id*.]

62.   The QA meeting was rescheduled for November 12, 2015. Plaintiff accepted the meeting request but then emailed the day of the meeting that she could not attend due to illness. [*Id*.]

63.   The meeting was again rescheduled, and Plaintiff again declined the meeting invitation the day before it was scheduled. [*Id*.]  Plaintiff then requested a meeting with Mr. Krasinski to discuss "moving forward." [Exhibit 21; Nov. 16 Email, Exhibit 22.]

64.     Plaintiff's meeting with Mr. Krasinski was scheduled for November 17, 2015. It was during this meeting that Plaintiff first reported Ms. McAlister's alleged racially charged statements. [Exhibit 11.] Plaintiff also told Mr. Krasinski that Ms. Craig was hostile and that Plaintiff could not work for her. Plaintiff stated that she would like to go back to working by herself like she did when she reported to Mr. Kieda. [Id.; Exhibit 3, 105:13-16.]

65.     On December 10, 2015, Plaintiff attended a meeting with Mr. Krasinski, Ms. Craig, and Ms. McAlister to discuss QA roles and responsibilities. This was the meeting Ms. Craig originally tried to schedule one month prior. [Exhibit 11.]

66.     During the December 10, 2015 meeting, Plaintiff stated that she could not work under the new organizational structure. [Exhibit 11.] Despite previously praising Ms. McAlister's work, Plaintiff questioned the expertise of Ms. McAlister and Ms. Craig, her new manager. [Id.]

67.     At or before December 10, 2015 meeting, all of the members of the QA team were asked to adjust their work schedules to be in the office Tuesday through Thursday and restrict working from home to Mondays and Fridays. [Exhibit 1, ¶47.] Check-6's facilities had been under construction for some time, and the trailers they were using did not have sufficient internet for everyone to work onsite. This meant that most employees were working from home. Around this time, the installation of new fiber cable had been completed, so the trailers were fully operational. The change to the QA schedule was intended to encourage workers to begin adjusting their schedules to use these facilities and to enable a better working relationship with the newly organized QA team. [Exhibit 1, ¶¶ 48-49.]

68.     On December 15, 2015, Plaintiff emailed Ms. Craig that she was "on PTO today." [Dec. 15 Email, Exhibit 23.] This email precipitated a conversation between Plaintiff and Ms. Craig about the new policy on working from home, the "standard practice" of not paying

contractors for time not worked, and Plaintiff's right to PTO under her contract. [*Id*.]  As Plaintiff's new manager, Ms. Craig was not privy to the details of Plaintiff's contract or the benefits Plaintiff had over other contractors at Check-6. [Exhibit 1, ¶ 50.] Mr. Krasinski, the general manager, intervened in the conversation and offered to discuss the issue with Plaintiff. [Exhibit 23.]

69.   In December 2015, Check-6 was continuing to experience financial difficulties. Plaintiff's questions regarding PTO triggered a review of her contract. After reviewing the cost of keeping Plaintiff on at the agreed upon monthly retainer, in addition to the deficiencies in Plaintiff's procedures reported by Ms. McAlister and Plaintiff's refusal to work under the new organizational structure, Check-6 decided to terminate Plaintiff's contract. [Exhibit 1, ¶ 52.]

70.   On December 17, 2015, Mr. Krasinski emailed Plaintiff that her contract was being terminated effective immediately. A letter setting forth the termination was also sent via certified mail. [Dec. 17 Email, Exhibit 27; Dkt No. 2, ¶ 48.]

71.   On December 18, 2015, Plaintiff filed a charge of discrimination with the EEOC. [Charge, Exhibit 28.] Plaintiff alleged harassment and discriminatory conduct by a coworker. Plaintiff did not allege retaliation and never amended her Charge. [*Id*.]

72.   On August 30, 2016, the IRS determined that Plaintiff was an employee of Check-6 for federal employment tax purposes.[1] [IRS Letter, Exhibit 24.] Plaintiff was required to pay her share of any unpaid taxes. [*Id*.]

**g.  Subsequent Cutbacks**

73.   Beginning in 2014, Check-6's revenue began significantly decreasing. Check-6 has been in the process of streamlining since that time. For example, in November 2015, Check-6 had 35 employees. That number dropped as low as 15, and it currently has only 21. [Exhibit 1, ¶ 53.]

---

[1] For the purposes of this Motion only, Check-6 does not dispute this finding.

74.    In 2015, Check-6 instituted multiple reductions in pay of 20% or more for the highest earners. Salaries for employees at all levels of the Company, including executives, have stayed static or continued to decrease since then. [Exhibit 1, ¶ 54.]

75.    At the time Plaintiff's contract was terminated, she was earning $104,000.00 per year with paid holidays, PTO, and the opportunity for bonuses. [Exhibit 5.] Though Plaintiff had taken on additional responsibilities, she was not officially acting as QA Manager. [Exhibit 1, ¶ 56.] Nevertheless, Plaintiff was one of the highest paid people, regardless of employment status, at Check-6; only the owners and managers were paid more than Plaintiff. [*Id.*]  Plaintiff's salary was more than double that of Ms. McAlister, who was also a QA analyst. [*Id.* at ¶ 55.]

76.    The current QA Manager at Check-6 oversees six analysts and earns only $80,000.00 per year. In 2018, the two highest paid QA analysts – the position held by Plaintiff – each earned less than $60,000.00 per year. The current Software Configuration Manager is paid less than half of Plaintiff's 2015 salary. [Exhibit 1, ¶ 57.]

## III. ARGUMENTS AND AUTHORITIES

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Id.* The burden of showing that no genuine issue of material fact exists is borne by the moving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy this burden by identifying a lack of evidence for the non-movant on an essential element of the non-movant's claim." *Adamson v. Multi Cmty.*

*Diversified Servs.*, 514 F.3d 1136, 1145 (10th Cir. 2008) (internal quotation and citation omitted).

In considering a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* "If the movant bears the burden of showing the absence of a genuine issue of material fact, the non-movant may not rest on its pleadings but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Mesa Oil, Inc. v. Ins. Co. of N. Am.*, 123 F.3d 1333, 1336 (10th Cir. 1997) (emphasis added). However, the mere existence of some evidence in support of the non-movant is inadequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a factfinder to reasonably find for the non-movant on that issue. *Anderson*, 477 U.S. at 249-50. To sustain the burden of proving a triable fact issue exists, the non-movant must adduce relevant, admissible evidence setting forth specific facts based upon personal knowledge. FED. R. CIV. P. 56(c). Where, as here, Plaintiff cannot meet this burden, summary judgment must be granted.

## B. TITLE VII AND SECTION 1981

Plaintiff has alleged discrimination and retaliation claims under both Title VII and Section 1981. While Title VII applies only to employees and requires claims to first be filed with the EEOC, Section 1981 does not have these restrictions. *See* 42 U.S.C. §§ 2000e, *et seq*.; 42 U.S.C. § 1981. Otherwise, the method of proving these claims is the same under both statutes. *Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005) ("In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII."). Defendant will address both the Title VII and the Section 1981 claims together.  For the purposes of this Motion only, Defendant will waive any procedural deficiencies in the Title VII claims and will not dispute the IRS's determination that Plaintiff was an employee of Check-6.

## C. DISCRIMINATION UNDER TITLE VII OR SECTION 1981

Plaintiff claims that she was qualified to be a full-time, regular employee with Check-6, but Check-6 intentionally denied her the position based on her race. [Dkt No. 2 at ¶¶ 57 and 64.] In order to prove this claim, Plaintiff must show that 1) she belongs to a protected class; 2) she was qualified for the position at issue; 3) she suffered an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Carney v. City & County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008); *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004). "Without direct proof of discrimination, a plaintiff in a race discrimination case must rely on the three-part, burden-shifting framework set out by the Supreme Court in *McDonnell Douglas*." *Barlo v. C.R. Eng., Inc.*, 703 F.3d 497, 505 (10th Cir. 2012). Under this framework, Plaintiff has the initial burden to establish a prima facie case of discrimination as set forth above. *Id.* If plaintiff does so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Adamson*, 514 F.3d at 1145. If Defendant is successful, Plaintiff must then show that the defendant's justification is pretextual. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000). Defendant is entitled to summary judgment if Plaintiff cannot establish a prima facie case and/or show that Defendant's reason was pretextual. *Barlow*, 703 F.3d at 505; *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).

### 1. Plaintiff Cannot Establish a Prima Facie Case of Discrimination

There is no dispute that Plaintiff is a member of a protected class or that she was qualified to be an employee at Check-6. However, Defendant is entitled to summary judgment because Plaintiff cannot prove the other two elements of her claim.

Plaintiff's alleged adverse act is that she was not converted from independent contractor to employee. It is not clear that Check-6's decision not to convert Plaintiff was adverse to Plaintiff's interests. Plaintiff admits that the QA industry typically operates on a short-term contract basis.

[Fact No. 19.]  In fact, Plaintiff identified only one other QA position she has held, either before or after her tenure with Check-6, where she was an employee of the company for which she worked. Rather, she testified that, for QA analysts, six month contracts are "pretty much the standard." [Fact No. 19.] Plaintiff's insistence that Check-6 should have deviated from this standard is inexplicable, particularly as the undisputed evidence shows that Plaintiff's conversion to employee would not have benefitted her financially.

Plaintiff's contract already provided her with a guaranteed monthly salary, paid holidays, paid time off, and the potential for bonuses. [Fact Nos. 10, 75.] Plaintiff also received two raises in 2014, including a raise of nearly 15%. [Fact Nos. 7, 10.] No other employee or contractor received a raise during that time period, including the two contractors who were converted in 2014. [Fact Nos. 11, 21, 24.] Further, some employees experienced multiple decreases in pay in 2015. [Fact No. 24.] Had Plaintiff been converted to employee during this period, she would not have been entitled to another raise. [Fact No. 17.] Moreover, if Check-6 had not been bound by Plaintiff's independent contractor agreement, Plaintiff may have been subject to the same salary cuts experienced by Check-6 employees. The only other benefits offered to employees not available to Plaintiff as an independent contractor were the Company's health insurance – which Plaintiff testified was unnecessary due to her coverage under her husband's plan – and the 401(k) plan. [Fact No. 17.] While the 401(k) plan did offer employer matching, the amount was capped at 3% of the employee's salary. [Fact No. 18.] The potential loss in matching funds is minimal in comparison to the raises received by Plaintiff and her avoidance of salary cuts.

Assuming, *arguendo*, the decision not to convert Plaintiff to employee status was adverse, Plaintiff cannot show that it was made under circumstances giving rise to the inference of discrimination. As evidence that the decision was racially motivated, Plaintiff alleges that two

white contractors were converted to employee when she was not, she saw eminently qualified African-American candidates passed over for jobs, she was asked to counsel an intern because of their shared racial ancestry, and she was "repeatedly subjected to racially offensive comments from a co-employee." [Complaint at ¶¶ 19-20, 30, 40.] None of these allegations is sufficient.

While Plaintiff can support her claim of discrimination by showing that other, similarly situated employees outside of her protected class were treated differently, she must establish that she was similarly situated to those employees in all relevant respects. *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). Similarly situated employees are "those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). In making this determination, a "court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff" and the would-be comparators. *Id.*

The two contractors identified by Plaintiff were not "similarly situated" under applicable case law. First, neither had the same job classification as Plaintiff – she was a QA Analyst while they were a Business Analyst and Software Developer respectively. Second, neither was in the same department as Plaintiff, which, because of the Company's financial and legal concerns, means they were not subject to the same employment circumstances or company policies. [Fact Nos. 4, 8, 20.]  Shortly after Plaintiff was hired in 2014, Check-6 laid off employees in QA (Plaintiff's department) and Development. [Fact No. 4.] These departments were then subject to a six month hiring freeze. [Fact No. 4.] Just as that hiring freeze ended, QA was subjected to an additional hiring freeze due to pending legal claims. [Fact No. 8.] One of the contractors cited by Plaintiff was part of the Architecture department, which was not subject to layoffs or a hiring freeze in 2014 when she was converted. [Fact No. 20.] The other contractor was part of

Development. [Fact No. 23.] While Development was under a hiring freeze following the layoffs, it was unaffected by the second freeze initiated by the legal claim. [Fact No. 22.] The contractor in Development was not converted during the hiring freeze but was asked to extend his contractor status until the hiring freeze ended in December 2014. [Fact No. 23.] Moreover, neither of these would-be comparators received a raise before, during, or after they were converted to employee. [Fact Nos. 21, 24.] Plaintiff, on the other hand, received two raises during the same time period. [Fact Nos. 7, 10.] Thus, not only were these contractors not "similarly situated," but Plaintiff was arguably treated more favorably than they were.

Plaintiff also appears to allege that Check-6's failure to hire other qualified African American candidates suggests that she was also passed over because of her race. However, there is no evidence that race was a factor in any hiring decision. After the initial round of interviews for the QA position, it was determined that Check-6 could not afford to pay someone a senior level salary, so the position was downgraded. [Fact No. 32.] While Plaintiff alleges that at least one of the African American candidates from the first round agreed to accept the downgraded salary of $65,000.00, the person who was ultimately hired was paid only $59,280.00. [Fact No. 34.] While Plaintiff may not have made the same hiring decision that Check-6 made, she was certainly not forced to hire someone who was unqualified. Plaintiff herself was responsible for determining which candidates received interviews. [Fact Nos. 31, 33.] Since the white male who was ultimately hired received an interview, he, presumably, met Plaintiff's standards for the job. In fact, Check-6 relied on Plaintiff's judgment to the extent that the candidate was eventually terminated from the position based solely on Plaintiff's recommendation. [Fact No. 35.]  Plaintiff also alleges that the same QA position was later offered to a female of Indian descent for $80,000.00. [Dkt No. 2 at ¶ 30.] That is true. However, after the last candidate failed to work out, Check-6 determined it needed

a more qualified candidate, which required a higher salary. This second candidate turned down the job, and the position was never refilled due to budgetary issues. [Fact Nos. 36-37.]

Plaintiff also points to an incident with an intern as evidence of Check-6's racial bias. [Dkt No. 2 at ¶ 30.] In 2013, Check-6 employed six summer interns, but only one – an African American female – was asked to return in 2014. [Fact No. 27.] When an issue with regard to the intern's personal hygiene arose, Plaintiff was asked to counsel the intern because her manager believed she was the "best person" for the job. [Fact No. 28.] Plaintiff argues, without evidence, that she was given this task solely because she was the same race as the intern. [Fact No. 29.] In reality, the intern reported directly to Plaintiff and shared an office with her, making Plaintiff far and away the "best person" to have such a delicate conversation. [Fact No. 27.] Rather than support Plaintiff's discrimination claims, this incident underscores Check-6's willingness to hire African American candidates and Plaintiff's utter lack of evidence of racial bias.

Finally, Plaintiff attempts to show racial bias by alleging that she was "repeatedly subjected to racially offensive comments from a co-employee." [Dkt. No. 2, ¶ 30.] "In general, statements by a non-decisionmaker . . . cannot be used to establish that a decision was tainted by a discriminatory animus." *Cuenca v. Univ. of Kan.*, 101 F. App'x 782, 788 (10th Cir. 2004). Rather, "[e]vidence demonstrating discriminatory animus in the decisional process needs to be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *McCrary v. Aurora Pub. Schs.*, 57 F. App'x 362, 367 (10th Cir. 2003) (quoting *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000)). Here, Plaintiff has identified two instances of racially offensive comments, both of which were allegedly made by a coworker in 2014. [Fact Nos. 47, 50.] Once Check-6 learned of the alleged comments in late 2015, an investigation was undertaken

immediately.[2] [Fact No. 49.]   Check-6 could not substantiate the comments. [Fact No. 49.] However, assuming the comments were actually made, they do not support Plaintiff's allegation that she was "repeatedly subject" to such comments nor do they support her claim that she was not converted to employee as a result of racial animus. None of the alleged comments were made by decisionmakers, nor were the decisionmakers even aware of the comments prior to making any decisions with regard to Plaintiff's employment status. [Fact No. 47 (indicating comments by coworker were reported after all conversion decisions were made).]

Drawing all reasonable inferences in Plaintiff's favor, there is simply no evidence that Check-6's decision not to convert Plaintiff was made under circumstances giving rise to an inference of race discrimination.   Plaintiff cannot establish the elements of her prima facie discrimination case, and Defendants are entitled to judgment as a matter of law on this claim.

**2. Defendant Had a Legitimate, Nondiscriminatory Reason for Not Converting Plaintiff**

Should the Court determine that Plaintiff has established a prima facie case of discrimination, Defendant is still entitled to summary judgment because it had a legitimate, nondiscriminatory reason for not converting Plaintiff from independent contractor to employee. Specifically, the evidence shows that Check-6 experienced a series of financial and legal difficulties that prevented it from making Plaintiff a full time employee. Simply put, Plaintiff was the victim of a series of unfortunate events.

Almost immediately after hiring Plaintiff, Check-6 received a bad financial report, and the Company was forced to lay off employees in Plaintiff's department. [Fact No. 4.] Check-6 made a business decision not to hire or convert any employees in the affected departments for at least

---

[2] Plaintiff waited to report these comments until nearly a year or more after they were allegedly made and more than a month after Check-6 had begun investigating Plaintiff's perceived racial bias from a coworker's use of the term "ma'am." [Fact No. 47, 64.]

six months following the layoffs. [Fact No. 4.] Unfortunately, before the hiring freeze could be lifted on Plaintiff's department, Check-6 was sued by a former QA employee. [Fact No. 8.] On the advice of counsel, Check-6 decided to extend the hiring freeze on QA until the litigation concluded. [Fact No. 8.] Around the same time, the price of oil began to fall significantly, and the Company's economic outlook deteriorated even more. [Fact No. 13.] Check-6 was forced to institute a hiring freeze for the entire company in 2015. [Fact No. 14.] This hiring freeze was still in place at the time the litigation against Check-6 concluded. [Fact Nos. 14-15.]

Other contractors were similarly affected by Check-6's economic woes. Not one contractor was converted to employee in 2015, and at least five other contractors who were at Check-6 during Plaintiff's time with the Company also maintained their contractor status well beyond their initial six month contracts. [Fact No. 26.] However, none of these other contractors were provided with raises, guaranteed monthly salaries, PTO, or the opportunity for bonuses like Plaintiff was. [Fact No. 16 (discussing "standard practice" for contractors).] Check-6 did everything it could, short of converting Plaintiff to an employee, to keep Plaintiff satisfied. Check-6 had been happy with Plaintiff's work and it was always the intention to convert her to employee status. Had the Company's financial and legal circumstances been different, Plaintiff would have been made an employee at the first possible opportunity.

## D. RETALIATION UNDER TITLE VII OR SECTION 1981

Plaintiff claims that, in retaliation for reporting the racist remarks of a coworker, Check-6 withdrew Plaintiff's ability to work from home, withdrew her previously approved paid time off, and terminated her contract. [Dkt No. 2, ¶¶ 72-74, 80-82.] In order to prove her retaliation claim, Plaintiff must show "(1) [she] engaged in opposition to racial discrimination that is protected under the statute; (2) a reasonable person would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the adverse action." *Salemi*

*v. Colo. Pub. Emples. Ret. Ass'n*, 2018 U.S. App. LEXIS 22928 (10th Cir. Aug. 17, 2018) (quoting *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017)). Just as with her discrimination claims, if Plaintiff does not have direct evidence that "retaliatory animus played a 'motivating part' in the employment decision," her claims must be evaluated under the *McDonnell Douglas* burden-shifting framework. *Parker Excavating, Inc.*, 863 F.3d at 1220.

There is no question Plaintiff engaged in protected activity by reporting the alleged racially insensitive comments of her coworker. Nor is there any dispute that Plaintiff experienced at least one adverse employment action. However, it appears that Plaintiff is relying solely on temporal proximity to show that the two events were causally related. [Dkt No. 2, ¶ 51 ("Consequently, within weeks of Plaintiff complaining about offensive racial incidents in the workplace, Plaintiff's terms and conditions of employment were detrimentally affected . . . ."] The Tenth Circuit has held that temporal proximity, on its own, is enough to establish a prima facie claim, but it is insufficient to overcome an employer's nondiscriminatory reason for the adverse action. *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013); *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 n.6 (10th Cir. 2007). As Check-6 has such a reason for each of the alleged adverse acts, it is entitled to summary judgment on Plaintiff's retaliation claims.

### 1. Working from Home

According to Plaintiff, at a meeting held on December 11, 2015, her working conditions were changed so that "she could no longer work from home, but would have to come to the Check-6 site Tuesday through Thursday." [Dkt No. 2, ¶ 41.] Though Plaintiff does not state she was the only person for whom this policy was changed, it is strongly implied. However, the undisputed facts show that *everyone* working on QA matters was asked to come into the office Tuesday through Thursday and restrict their time working from home to Mondays and Fridays. [Fact No.

67.]

A few months prior to the meeting in question, Plaintiff's QA department had undergone a reorganization. Check-6 moved to streamline its procedures and create consistency among the various divisions. [Fact No. 52.] As a result, a new organizational chart and QA roles were implemented. [Fact No. 53.] Around the same time, Check-6 was trying to encourage its workers to return to the worksite as the internet had recently been upgraded to support everyone. [Fact No. 67.] The lengthy construction meant that many, if not most, employees had been regularly working from home. In the midst of all of this change, the new QA group was dealing with communication issues and an HR investigation, which caused some tension in the group. The decision was made to have *all* members of the QA team adjust their work schedules to be in the office Tuesday through Thursday. The reason for the change was twofold: 1) to encourage them to begin adjusting their schedules to use the worksite and 2) to facilitate a better working relationship with the newly organized QA team. [Fact No. 67.]

Check-6 had a legitimate, nonretaliatory reason to ask Plaintiff, and everyone else she worked with, to limit their working from home to specific days. Plaintiff cannot point to a policy that affects all of the people in her department and declare it as an act of retaliation against her personally. This claim must fail.

### 2.  Withdrawn PTO

Plaintiff also alleges that, on December 15, 2015, her previously approved PTO was withdrawn by her new manager and Plaintiff was advised she would not be paid for the time off she had planned to take beginning December 18, 2015. [Dkt No. 2, ¶¶ 44, 73, 81.]   However, Plaintiff was never officially denied PTO. More importantly, the emails between Plaintiff and her manager exchanged that day make it clear that whatever threat there was regarding Plaintiff's PTO, it was the result of a misunderstanding. [Exhibit 23.] As Plaintiff's new manager, Ms. Craig was not aware of the terms of Plaintiff's contract, which were different than other contractors at Check-6. [Fact No. 68.] This is evident in her explanation that Plaintiff would not be paid for time not worked because that was the "standard practice" for contractors. Once Plaintiff noted that her contract was nonstandard, the general manager intervened in the conversation. [Fact No. 68.] This claim also fails.

### 3.  Termination of Plaintiff's Contract

The decision to terminate Plaintiff's contract was made in the best interests of the Company. Plaintiff signed her last contract with Check-6 on November 21, 2014. [Fact Nos. 10, 16.] This contract called for Plaintiff to receive a monthly retainer of $8,667.00 per month ($104,004.00 per year) and provided for performance based bonuses and paid time off. [Fact No. 10.] At the time this contract was signed, Check-6 had begun to experience some financial difficulties, but the business was overall steady. The price of oil, which is a good indicator of Check-6's financial situation, was over $75.00 per barrel. [Fact No. 13.] However, almost immediately after Plaintiff's new contract was signed, the oil market began to fall in earnest, and Check-6 had to take preventive measures. [Fact Nos. 13, 4.] A company-wide hiring freeze was implemented sometime in 2015, and Check-6 instituted multiple reductions in pay of 20% or more

for the highest earners. [Fact Nos. 13, 73-74.] Plaintiff was unaffected by these cuts. As a result, Plaintiff became one of the highest paid people in the Company. [Fact No. 73.]

As discussed above, Check-6 began standardizing its QA processes in September 2015. Plaintiff, who had previously worked alone and with little supervision or guidance, began working with QA analysts from other Check-6 divisions. [Fact Nos. 52-53.] Subsequently, deficiencies in Plaintiff's processes were uncovered. [Fact No. 56.] Plaintiff, who had first praised the efforts of the new QA analyst, reported to her manager that she believed there was an organized effort by her new coworkers to force her to quit. [Fact Nos. 43, 55, 57.]   Shortly thereafter, Plaintiff's manager resigned from Check-6, and Plaintiff began reporting to a new manager. [Fact Nos. 59.] She began skipping meetings with little or no notice. [Fact Nos. 61-63.] On more than one occasion, Plaintiff told the General Manager that she could not work under the new organizational scheme and questioned the qualifications of her new manager and the new QA analyst. [Fact Nos. 64, 66.]

Plaintiff's conversation with her manager regarding PTO triggered a review of Plaintiff's contract. [Fact No. 69.] At that time, Check-6 continued to struggle financially – the price of oil had fallen to under $40 per barrel – and Plaintiff's contract called for an annual salary of more than double the other QA analyst with whom she was working. [Fact No. 13, 75.] Deficiencies in Plaintiff's QA work had recently been discovered, and Plaintiff had begun skipping meetings and refusing to come into the office as requested. [Fact Nos. 61-63, 68.]   Moreover, Plaintiff had repeatedly expressed her displeasure with Check-6's business decisions and her disinclination to work under the new organizational structure. [Fact Nos. 64, 66.] After considering all of these factors, Check-6 determined that it was in the best interest of the Company to part ways with

Plaintiff. [Fact No. 69.] Plaintiff's contract was officially terminated on December 17, 2015. [Fact No. 70.]

In sum, the record shows that Check-6 had a legitimate, non-discriminatory reason for terminating Plaintiff's contract. Plaintiff's reliance on the temporal proximity of her protected activity and all of the alleged adverse acts is insufficient to establish Defendant's reasons as merely pretextual. Check-6 is entitled to summary judgment on Plaintiff's retaliation claims.

## IV. CONCLUSION

Defendant's Motion for Summary Judgment should be sustained on several grounds. First, Check-6 is entitled to summary judgment on Plaintiff's race discrimination claims because there is no evidence that Check-6's decision not to convert Plaintiff from independent contractor to employee was adverse to Plaintiff or that it took place under circumstances giving rise to an inference of race discrimination. Moreover, Check-6's legitimate, nondiscriminatory reason for being unable to convert Plaintiff is supported by the evidence, and Plaintiff cannot establish that this reason was pretextual. Second, Check-6 is entitled to summary judgment on Plaintiff's retaliation claims. Plaintiff has no evidence other than temporal proximity that the adverse employment actions were causally related to her protected activity. Check-6's legitimate, nondiscriminatory reasons for each of the alleged adverse actions are supported by the record, and temporal proximity is insufficient to show pretext. Summary judgment is appropriate and required as a matter of law.

WHEREFORE, premises considered, Check-6 Training Systems, LLC, moves the Court for an Order granting it summary judgment on all of Plaintiff's claims, and for such other relief the Court deems just and equitable.

Respectfully submitted,

/s/ Denelda Richardson
Denelda Richardson, OBA No. 20103
Michael Robertson, OBA No. 32551
Jessica Fu, OBA No. 30560
**RHODES HIERONYMUS JONES**
   **TUCKER & GABLE, PLLC**
P.O. Box 21100
Tulsa, Oklahoma 74121
(918) 582-1173 – Telephone
(918) 592-3390 – Facsimile
drichardson@rhodesokla.com
mrobertson@rhodesokla.com
jfu@rhodesokla.com
*Attorneys for Defendant, Check-6 Training Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

David R. Keesling
Timothy S. Kittle

/s/ Denelda Richardson
Denelda Richardson