# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

ALEASIA F. PULLUM,

    Plaintiff,

v.

CHECK-6 TRAINING SYSTEMS, INC.,

    Defendant.

Case No. 16-CV-716-GKF-FHM

## OPINION AND ORDER

In this lawsuit, plaintiff asserts claims for racial discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981. Before the court is the Motion for Summary Judgment [Doc. 46] submitted by defendant Check-6 Training Systems, Inc. For the reasons set forth below, the motion is granted.

### I. Legal Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as

a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## II. Facts

### A. Parties

Plaintiff is an American of African descent. [Doc. 2, p. 2 ¶ 10; Doc. 13, p. 2 ¶ 10]. Check-6 is a for-profit business corporation that provides "operational excellence and leadership coaching" for its clients, which are mostly businesses in the oil and gas production industry. [Doc. 2, p. 2 ¶ 5; Doc. 13, p. 2 ¶ 5; Doc. 46, p. 6 ¶ 1].[1]

### B. Plaintiff's History with Check-6

On February 5, 2014, Check-6 hired plaintiff as an independent contractor for a six-month term. [Doc. 46, p. 6 ¶ 3]. Plaintiff was hired as a Senior Quality Assurance Analyst on the Well Control Virtual Instructor ("WCVI") project, which is one of Check-6's three service divisions. [Doc. 46, p. 6 ¶ 2]. There were also quality assurance ("QA") analysts in the other two service divisions, but the QA departments of each division operated separately. [*Id.*].

Plaintiff learned about the position with Check-6 upon being contacted by Mike Robinson, a QA manager. [Doc. 48, p. 9 ¶ 2; Doc. 49, p. 3]. Plaintiff was originally told the position she was seeking was for regular, full-time employment, but she was advised during negotiations that a "new HR policy" required new hires to work as contractors for six months before being converted

---

[1] In her response brief, plaintiff specifically disputes only the following facts from Check-6's statement of material facts: 5, 7, 12, 17, 20, 22, 25, 28, 32, and 69. [Doc. 48, pp. 14–17]. Therefore, the court deems admitted the remaining facts set forth in Check-6's statement of material facts. *See* LCvR56.1(c).

2

to regular, full-time "W-2" employees. [Doc. 48, p. 9 ¶ 1; Doc. 49, p. 3]. QA analysts, like plaintiff, typically rely on contract work, and plaintiff testified that "six months is pretty much the standard or a year" for QA analyst contracts. [Doc. 46, p. 9 ¶ 19].

Pursuant to the terms of her contract, signed on February 20, 2014, plaintiff's hourly rate was $40.86 per hour. [Doc. 46, p. 6 ¶ 3]. The contract promised a performance evaluation at the end of six months with the "potential to become a W-2 employee with Check-6." [Doc. 48, p. 10 ¶ 6; Doc. 49, p. 3]. The contract specified an end date of July 23, 2014. [Doc. 46, p. 6 ¶ 5].

Check-6 has been in the process of streamlining since its revenue began significantly decreasing in 2014. [Doc. 46, p. 19 ¶ 73]. In response to a report on the company's financial outlook, Check-6 laid off approximately eight employees in the QA and Development departments in May 2014. [Doc. 46, p. 6 ¶ 4]. As a result, Check-6 placed a hiring freeze on both QA and Development, with no new hires or conversions from contractor to employee approved for six months. [*Id.*].

Plaintiff continued working for Check-6 after the expiration of her first contract. [Doc. 48, p. 10 ¶ 9; Doc. 49, p. 3]. Although Check-6 was happy with plaintiff's performance, it did not make her an employee because QA and Development remained subject to a hiring freeze. [Doc. 46, p. 6 ¶ 6].

In November 2014, Check-6 had lifted the hiring freeze for the QA and Development departments. [Doc. 46, p. 7 ¶ 8]. However, Check-6 had been sued by a former QA employee and, at the advice of counsel, made a business decision not to hire or convert anyone in the QA department until the litigation concluded. [*Id.*]. On November 21, 2014, plaintiff signed a new six-month contract. [Doc. 46, p. 7 ¶ 10; Doc. 48, p. 11 ¶ 13]. Check-6 informed plaintiff of the

reason she could not be converted to an employee and advised her that the litigation would likely be concluded by the time her new contract expired. [Doc. 46, p. 7 ¶ 9; Doc. 48, p. 11 ¶ 16].

Instead of specifying an hourly rate, the new contract provided plaintiff with a monthly retainer of $8,667.00. [Doc. 46, p. 7 ¶ 10; Doc. 48, p. 11 ¶ 13]. The retainer was the equivalent of $104,004.00 per year—a raise of approximately fifteen percent. [*Id.*]. The contract provided most of the benefits of a regular employee, except for participation in Check-6's 401(k) plan. [Doc. 48, p. 11 ¶ 16; Doc. 49, p. 3]. Plaintiff was the only contractor or employee who received a raise in 2014. [Doc. 46, p. 7 ¶ 11]. The new contract specified an end date of May 16, 2015. [Doc. 48, p. 11 ¶ 15; Doc. 49, p. 3].

In 2015, Check-6 began facing further financial difficulties because of the falling price of oil and once again implemented hiring practices that prevented contractors from converting to employees and limited hiring across the board. [Doc. 46, p. 8 ¶¶ 13–14]. Check-6 instituted multiple reductions in pay of twenty percent or more for the highest earners. [Doc. 46, p. 20 ¶ 74]. Salaries for employees at all levels of the company, including executives, have remained static or continued to decrease since then. [*Id.*]. In May 2015, the litigation that prevented plaintiff's conversion to employee status concluded. [Doc. 46, p. 8 ¶ 15]. Although Check-6 had intended to convert plaintiff at that time, the company's financial situation again prevented it from doing so. [*Id.*]. During 2015, Check-6 did not convert any independent contractors to employee status in any department. [Doc. 46, p. 8 ¶ 14].

Plaintiff's last written contract with Check-6 officially expired on May 16, 2015, but plaintiff continued to work for Check-6 and receive her monthly retainer. [Doc. 46, p. 8 ¶ 16]. In August 2015, plaintiff asked her manager, Adam Kieda, if she should be concerned about her position because of the financial position of the company. [Doc. 46, p. 17 ¶ 59]. Mr. Kieda advised

that "everyone should have a plan B with the state of affairs these days, regardless of position. It's the smart thing to do with the current unpredictability." [*Id.*].

In September 2015, a lull in projects afforded Check-6 the opportunity to streamline many of its procedures. [Doc. 46, p. 16 ¶ 52]. Previously, plaintiff's quality assurance work at WCVI followed its own procedures with little to no oversight or guidance. [*Id.*]. In order to create consistency across Check-6, members of the QA department in a different division were moved to WCVI to implement the company's best practices. [*Id.*]. A new organizational chart and QA roles were implemented. [Doc. 46, p. 16 ¶ 53]. Rather than continue to report to Mr. Kieda, plaintiff began reporting to Kristi Craig. In addition, Marissa McAlister, a QA analyst with the other division, began assisting plaintiff with QA duties. [*Id.*].

On September 30, 2015, Ms. McAlister began QA testing a project with plaintiff. [Doc. 46, p. 16 ¶ 54]. On October 7, 2015, Ms. McAlister sent an e-mail to Ms. Craig outlining several deficiencies she noted in the WCVI QA procedures used by plaintiff. [Doc. 46, p. 16 ¶ 56]. Ms. Craig indicated these issues would be discussed with Mr. Kieda, the project manager. [*Id.*].

On October 28, 2015, Mr. Kieda announced his resignation, effective October 30, 2015. [Doc. 46, p. 17 ¶ 59]. On November 3, 2015, plaintiff e-mailed a consulting firm requesting assistance in finding a new job. [Doc. 46, p. 17 ¶ 60].

On November 5, 2015, Ms. Craig, plaintiff's new manager, scheduled a meeting for November 10, 2015, to discuss QA roles and responsibilities. [Doc. 46, p. 17 ¶ 61]. Plaintiff waited until the day of the scheduled meeting to decline the meeting request, stating that she was working from home. [*Id.*]. The QA meeting was rescheduled for November 12, 2015. [Doc. 46, p. 17 ¶ 62]. Plaintiff accepted the meeting request but then e-mailed the day of the meeting that she could not attend due to illness. [*Id.*]. The meeting was again rescheduled, and plaintiff again

declined the meeting invitation one day before the scheduled date. [Doc. 46, p. 17 ¶ 63]. Plaintiff then requested a meeting with Joseph Krasinski, the General Manager, to discuss "moving forward." [*Id.*].

Plaintiff's meeting with Mr. Krasinski was scheduled for November 17, 2015. [Doc. 46, p. 18 ¶ 64]. During the meeting, plaintiff reported for the first time that Ms. McAlister had made racially charged statements. [*Id.*]. Plaintiff also told Mr. Krasinski that Ms. Craig was hostile and that plaintiff could not work for her. [*Id.*]. Plaintiff stated that she would like to go back to working by herself like she did when she reported to Mr. Kieda. [*Id.*].

On December 10, 2015, plaintiff attended a meeting with Mr. Krasinski, Ms. Craig, and Ms. McAlister to discuss QA roles and responsibilities. [Doc. 46, p. 18 ¶ 65]. This was the meeting Ms. Craig originally tried to schedule one month prior. [*Id.*]. During the meeting, plaintiff stated she could not work under the new organizational structure. [*Id.*]. Despite previously praising Ms. McAlister's work, plaintiff questioned the expertise of Ms. McAlister and Ms. Craig, her new manager. [*Id.*]. Plaintiff asserts that Ms. McAlister screamed at her during the meeting and that neither Ms. Craig nor Mr. Krasinski took any corrective action. [Doc. 48, p. 12 ¶ 25; Doc. 49, p. 4]; *see also* [Doc. 46-11, pp. 13–14 (Mr. Krasinksi's meeting notes stating, "Voices were raised from both Marissa and Aleasia.")].

On December 15, 2015, plaintiff e-mailed Ms. Craig that she was "on PTO today." [Doc. 46, p. 18 ¶ 68]. This e-mail precipitated a conversation between plaintiff and Ms. Craig about the new policy on working from home, the "standard practice" of not paying contractors for time not worked, and plaintiff's right to PTO under her contract. [*Id.*]. As plaintiff's new manager, Ms. Craig was not privy to the details of plaintiff's contract and was not aware that plaintiff, unlike other contractors, was entitled to paid PTO. [*Id.*]; *see also* [Doc. 48-1, p. 37 at 101:10–18]. Mr.

Krasinski intervened in the conversation and offered to discuss the issue with plaintiff. [Doc. 46, p. 18 ¶ 68].

Check-6 asserts that plaintiff's questions regarding PTO triggered a review of her contract—which Check-6 decided to terminate after reviewing the cost of keeping plaintiff on at the agreed upon monthly retainer, in addition to the deficiencies in plaintiff's procedures reported by Ms. McAlister and plaintiff's refusal to work under the new organizational structure. [Doc. 46, p. 19 ¶ 69]. On December 17, 2015, Mr. Krasinski e-mailed plaintiff that her contract was being terminated effective immediately. [Doc. 46, p. 19 ¶ 70]. A letter setting forth the termination was also sent via certified mail. [*Id.*]. The letter did not provide any explanation for the termination. [Doc. 48, p. 13 ¶ 31; Doc. 49, p. 3].

At the time plaintiff's contract was terminated, she was earning $104,000.00 per year with paid holidays, paid time off, and the opportunity for bonuses. [Doc. 46, p. 20 ¶ 75]. She was one of the highest paid people at Check-6, with only the owners and managers being paid more. [*Id.*]. Her salary was more than double that of Ms. McAlister, who was also a QA analyst. [*Id.*]. The current QA manager at Check-6 oversees six analysts and earns $80,000.00 per year. [Doc. 46, p. 20 ¶ 76]. In 2018, the two highest paid QA analysts each earned less than $60,000.00 per year. [*Id.*].

On December 18, 2015, one day after her termination, plaintiff filed a charge with the Equal Employment Opportunity Commission, alleging harassment and discriminatory conduct by a co-worker. [Doc. 46, p. 19 ¶ 71]. On August 30, 2016, the Internal Revenue Service determined that plaintiff was an employee of Check-6 for federal employment tax purposes, requiring her to pay her share of any unpaid taxes. [Doc. 46, p. 19 ¶ 72].

## C. Comparators

Check-6 hired Jeanne Hoch, a white female, as an independent contractor around the same time plaintiff was hired. [Doc. 46, p. 9 ¶ 20; Doc. 48, p. 10 ¶ 11]. About four or five months after hiring Ms. Hoch, Check-6 converted her from an independent contractor to an employee. [Doc. 46, p. 9 ¶ 20; Doc. 48, p. 10 ¶ 11; Doc. 49, p. 2]. Despite being converted to an employee, Ms. Hoch did not receive a pay raise in 2014 or 2015. [Doc. 46, p. 9 ¶ 21]. Ms. Hoch was a business analyst and part of the Architecture department, which was not subject to the hiring freeze that affected the QA and Development departments. [Doc. 46, p. 9 ¶ 20].

Check-6 hired Dan Horner, a white male, as an independent contractor around the same time as plaintiff. [Doc. 46, p. 9 ¶ 22; Doc. 48, pp. 15–16; Doc. 49, p. 2]. In December 2014, Check-6 converted Mr. Horner from an independent contractor to an employee. [Doc. 46, p. 9 ¶ 22; Doc. 48, pp. 15–16]. Mr. Horner worked as a Senior Developer. [Doc. 46, p. 9 ¶ 22; Doc. 48, pp. 15–16]. At the time of Mr. Horner's conversion, the hiring freeze that had impacted the QA and Development departments was no longer in place, and the Development department was not affected by the then-pending litigation. [Doc. 46, p. 9 ¶ 22; Doc. 48, pp. 15–16].

During plaintiff's tenure with Check-6, at least five workers remained independent contractors in excess of six months:

- a white male software developer was classified as an independent contractor from 2011 to present;
- a white male courseware developer was classified as an independent contractor from September 2014 until March 2016;
- a white male in customer support was classified as an independent contractor from December 2014 until March 2016;

8

- a white male in product support was classified as an independent contractor from May 2015 until March 2016; and

- a non-white male software architect was classified as an independent contractor from June 2015 until June 2016.

[Doc. 46, p. 10 ¶ 26].

**D. Summer Intern**

During the summer of 2013, Check-6 employed six interns. [Doc. 46, p. 10 ¶ 27]. Only one of those interns, an African-American female, was asked to return to Check-6 in the summer of 2014. [*Id.*]. This intern reported directly to plaintiff and was co-located with plaintiff. [*Id.*]. An issue arose regarding the intern's personal hygiene, and plaintiff was asked to counsel the intern. [Doc. 46, p. 11 ¶ 28]. Plaintiff testified that she was successful in counseling the intern and felt like it was an opportunity to mentor her and provide guidance. [*Id.*]. Plaintiff's complaint alleges the reason she was given the task was because of her race [Doc. 2, p. 5 ¶ 30(a)], but plaintiff admits she has no evidence that it was. [Doc. 46, p. 11 ¶ 29]. Plaintiff never reported to anyone at Check-6 that she believed she had been asked to counsel the intern because of her race. [*Id.*].

**E. Hiring for QA Position**

Sometime in late 2014 or early 2015, Check-6 began the process of hiring a contractor for a QA position in the WCVI division. [Doc. 46, p. 11 ¶ 30]. As the only member of the QA team, plaintiff was a significant part of the hiring process, though she did not have the final say over who was hired. [*Id.*]. The hiring process for the QA position began with plaintiff reviewing all of the resumes. [Doc. 46, p. 11 ¶ 31]. Plaintiff then chose candidates for telephone interviews, which plaintiff also conducted. [*Id.*]. Finally, based on their resumes and telephone interviews, plaintiff chose the candidates to be brought in for in-person interviews. [*Id.*]. Plaintiff's manager and another employee interviewed those candidates in-person along with plaintiff. [*Id.*]. Throughout

the hiring process for the QA position, plaintiff had discretion in choosing the candidates who were considered. [Doc. 46, p. 12 ¶ 33].

The first round of candidates included two qualified African-American females. [Doc. 46, p. 11 ¶ 32; Doc. 48, p. 13 ¶ 33]. After a review of its finances, Check-6 decided to downgrade the QA position and offer a smaller salary. [Doc. 46, p. 11 ¶ 32]. Candidates for the junior-level position would have less technical experience, which would cost less. [*Id.*]. Plaintiff asserts that one of the African-American female candidates was willing to accept a salary of $65,000.00. [Doc. 48, pp. 13–14 ¶¶ 33–34; Doc. 49, p. 14]. The candidate ultimately hired for the QA position (at the downgraded junior level) was Donovan Stewart, a white male, at a salary of $59,280.00. [Doc. 46, p. 12 ¶ 34; Doc. 48, p. 14 ¶ 36]. He began in February 2014, but he did not work out and was terminated at plaintiff's recommendation, effective June 30, 2015. [Doc. 46, p. 12 ¶ 35; Doc. 48, p. 14 ¶ 36].

When looking for Mr. Stewart's replacement, Check-6 determined that it would be better for the company to pay more for a contractor with better experience. [Doc. 46, p. 12 ¶ 36]. As a result, the position was offered at a higher salary to a qualified, female candidate of Indian descent. [Doc. 46, p. 12 ¶ 36; Doc. 48, p. 13 ¶ 33]. This candidate turned down the offer. [*Id.*]. Plaintiff continued to look for a replacement for the terminated QA candidate until she was advised on August 30, 2015 that, due to financial concerns, the QA position would not be filled. [Doc. 46, p. 12 ¶ 37].

## F. Offensive Comments

In approximately March 2014, Check-6 hired an employee named Ryan Cagle as an executive assistant. [Doc. 46, p. 12 ¶ 38]. Around the time Ms. Cagle joined the company, she sent an e-mail to plaintiff wherein she referred to plaintiff as "ma'am." [*Id.*]. Ms. Cagle routinely

used both "sir" and "ma'am" with all of her coworkers. [*Id.*]. However, she apologized to plaintiff after plaintiff told Ms. Cagle that "ma'am" made plaintiff feel old. [*Id.*].

Following a Skype exchange with plaintiff on October 9, 2015, Ms. Cagle reported concerns about communication with plaintiff to Ms. Craig, who approached Mr. Kieda, plaintiff's manager. [Doc. 46, pp. 13–14 ¶¶ 42–43]. Mr. Kieda determined there might be a communication problem, so Mr. Kieda called plaintiff to discuss the situation. [*Id.*]. Plaintiff denied having a problem with Ms. Cagle, but complained about Ms. Cagle's use of the word "ma'am," noting that she perceived a racial bias in Ms. Cagle's continued use of the term and that it was "catching on" with Ms. Craig. [*Id.*]. Plaintiff also reported that she believed Ms. Cagle, Ms. Craig, and Ms. McAlister had formed a clique with the goal to make plaintiff uncomfortable enough to quit. [*Id.*]. Mr. Kieda offered to facilitate a meeting with the group in order to resolve any issues. [*Id.*].

In an e-mail sent on October 9, 2015, Mr. Kieda assured plaintiff that she was a valued part of the team and that his goal was to find a way to help everyone work together. [Doc. 46, p. 14 ¶ 44]. Plaintiff's e-mails in response emphasize Ms. Cagle's alleged shortcomings. [*Id.*]. Specifically, plaintiff noted that Ms. Cagle "has been from her first day, trying to cause trouble with" plaintiff, characterizing her as that "one person who don't want to get along, establish a good working relationship or want you to succeed." [*Id.*].

Joseph Krasinski, the General Manager, took over the investigation on or about October 9, 2015. [Doc. 46, p. 14 ¶ 45]. On October 13, 2015, Mr. Krasinski and Jason McAlister, the Assistant General Manager, met with plaintiff to discuss her claims of racial bias against Ms. Cagle, Ms. Craig, and Ms. McAlister. [*Id.*]. The discussion again focused on Ms. Cagle's use of the word "ma'am" and Ms. Cagle's "tone." [*Id.*].

On November 17, 2015, plaintiff reported to Mr. Krasinski for the first time that Ms. McAlister had made racially insensitive comments the year before. [Doc. 46, p. 15 ¶ 47; Doc. 48, p. 12 ¶ 24]. Specifically, plaintiff reported that, in August 2014, Ms. McAlister had made inflammatory comments about rioters in Ferguson, Missouri and then, in December 2014, Ms. McAlister told plaintiff that someone told her that black people had tails. [Doc. 46, p. 15 ¶ 47; Doc. 48, p. 11 ¶¶ 18–20].

Plaintiff did not report Ms. McAlister's statements at the time they took place, nor did plaintiff report Ms. McAlister's statements during the first month of Check-6's investigation into her claims of racial bias. [Doc. 46, p. 15 ¶ 48]. Immediately following plaintiff's disclosure on November 17, 2015, the company's HR representative traveled from Tulsa to Fort Worth, where plaintiff and the others were located, to investigate plaintiff's allegations. [Doc. 46, p. 15 ¶ 49]. Although the HR representative interviewed all of the alleged participants and witnesses, the events as described by plaintiff could not be corroborated. [*Id.*]. The investigation was concluded on November 23, 2015. [*Id.*].

Other than Ms. Cagle's use of the word "ma'am" and Ms. McAlister's two alleged statements, plaintiff never reported any other incidents of offensive comments. [Doc. 46, p. 15 ¶ 50]. Plaintiff's written statement to HR on November 19, 2015 included only the two alleged statements in 2014. [*Id.*]. At HR's recommendation, Mr. McAlister requested that no one in the Check-6 offices use the terms "sir" or "ma'am" in order to avoid giving others offense. [*Id.*].

### III. Analysis

#### A. Discrimination under Title VII and Section 1981

Plaintiff asserts claims for employment discrimination pursuant to both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981. In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought

under Section 1981 or Title VII. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1168 (10th Cir. 2018). A plaintiff can show intentional discrimination either by direct or indirect evidence. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017). Where, as here, a plaintiff lacks direct evidence of discrimination, the analysis starts with the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011). Then, the defendant may come forward with a legitimate, non-discriminatory rationale for the adverse employment action. *Id.* If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual. *Id.*

**1. Prima Facie Case**

To make out a prima facie case of discrimination, a plaintiff must demonstrate "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Payan*, 905 F.3d at 1168. The "critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *DePaula*, 859 F.3d at 970 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000)).

Here, there is no dispute that plaintiff is a member of a protected class. She claims that she was qualified to be a full-time, regular employee, but Check-6 intentionally denied her the position based on race. The court assumes without deciding that Check-6's failure to convert plaintiff from a contractor to an employee constituted an adverse employment action.

In support of her discrimination claims, plaintiff identifies two white contractors—Jeanne Hoch and Dan Horner—who were converted to employee status. To show disparate treatment, plaintiff must establish she was "similarly situated" to Ms. Hoch and Mr. Horner "in all relevant

respects." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). Generally, similarly situated employees are "those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Id.* (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)). But plaintiff does not dispute that Ms. Hoch and Mr. Horner did not hold the same job as plaintiff or even work in the same department—and that they were therefore subject to different employment circumstances and company policies. At the same time, plaintiff does not dispute that at least five other workers remained independent contractors in excess of six months during plaintiff's tenure with Check-6. Of these contractors, four were white, and three worked in either Development or Architecture—the same departments in which plaintiff's would-be comparators worked. Accordingly, plaintiff has failed to show disparate treatment among similarly situated workers. Therefore, plaintiff has failed to establish a prima facie case of discrimination, and Check-6 is entitled to summary judgment on plaintiff's discrimination claims.

### 2. Non-Discriminatory Rationale

Even if plaintiff had established a prima facie case, she has failed to show that the legitimate, non-discriminatory rationale proffered by Check-6 is pretextual. Check-6 has presented evidence that a series of financial and legal difficulties caused it not to convert plaintiff from contractor to employee status.

A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision. *DePaula*, 859 F.3d at 970. This is often accomplished "by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013)). In determining whether the proffered reason for a decision

is pretextual, courts examine the facts as they appear to the person making the decision, and do not look to the plaintiff's subjective evaluation of the situation. *Id.*

Here, plaintiff has not substantively disputed the reasons proffered by Check-6. She has offered no evidence or argument to refute Check-6's description of its financial issues, the hiring freezes related to layoffs and litigation, or the company's continued downsizing. Nor has she disputed that these same concerns affected other contractors.

Plaintiff suggests that Check-6's proffered explanations are pretextual because (1) she was told a different reason for Ms. Hoch's conversion than the one provided by Check-6 in the instant motion, and (2) she learned of Mr. Horner's conversion a year after it took place. [Doc. 48, p. 22]. In particular, plaintiff asserts that Mr. Krasinski told her that Ms. Hoch was not subject to the same six-month waiting period that applied to plaintiff because Ms. Hoch, unlike plaintiff, came to Check-6 through a consulting firm. [Doc. 48, p. 10 ¶ 11; Doc. 48-2, p. 3]. But plaintiff does not explain how Mr. Krasinski's alleged statement was false or inconsistent with the reasons proffered by Check-6 for not converting plaintiff to employee status. As discussed above, plaintiff has failed to show that Ms. Hoch or Mr. Horner were similarly situated to her. Plaintiff does not dispute that Ms. Hoch was a business analyst and part of the Architecture department, which was not subject to the hiring freeze that affected the QA and Development departments. Nor does plaintiff dispute that Mr. Horner was a Senior Developer and that, at the time of his conversion, the hiring freeze that had impacted the QA and Development departments was no longer in place. Plaintiff has not shown that Check-6 was under any obligation to discuss the details of Ms. Hoch's or Mr. Horner's conversions with her. The mere fact that Check-6 did not fully apprise plaintiff of its business decisions and the private employment agreements of *other* workers is not evidence of pretext.

Plaintiff also argues that Check-6's failure to hire two *other* qualified African-American candidates for a *separate* QA position "is consistent with" her claim that she was passed over because of her race. [Doc. 28, p. 21]. However, plaintiff has presented no evidence that race was a factor in Check-6's hiring decisions. Check-6 asserts that, after the initial round of interviews for the QA position, it determined that it could not afford to pay someone a senior-level salary, so the position was downgraded. While plaintiff alleges that at least one of the African-American candidates from the first round was willing to accept a downgraded salary of $65,000.00, the individual who was ultimately hired was paid only $59,280.00. Plaintiff has not identified sufficient evidence to support an inference of discrimination in Check-6's decision not to hire an African-American candidate for a *separate* QA position—much less an inference of discrimination in Check-6's decision not to convert plaintiff from contractor to employee status.

Plaintiff also highlights two instances of racially offensive comments allegedly made by Ms. McAlister in 2014. Generally, however, statements by a non-decisionmaker "cannot be used to establish that a decision was tainted by discriminatory animus." *Cuenca v. Univ. of Kansas*, 101 F. App'x 782, 788 (10th Cir. 2004) (citing *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998)). "Evidence demonstrating discriminatory animus in the decisional process needs to be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *McCrary v. Aurora Pub. Sch.*, 57 F. App'x 362, 367 (10th Cir. 2003) (quoting *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000)). None of the alleged comments were made by a decisionmaker, and there is no evidence that any decisionmaker was aware of the comments when deciding whether to convert plaintiff from contractor to employee status.

In short, Check-6 has provided a non-discriminatory rationale for its decision not to convert plaintiff to employee status, and plaintiff has failed to identify evidence sufficient to allow a reasonable factfinder to conclude that Check-6's proffered rationale is unworthy of credence. Therefore, plaintiff's discrimination claims fail as a matter of law.

### B. Retaliation under Section 1981

Plaintiff asserts a claim for retaliation pursuant to Section 1981.[2] As with her discrimination claims, plaintiff's retaliation claim is evaluated under the *McDonnell Douglas* burden-shifting framework. A prima facie case of retaliation requires the plaintiff to show that (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Payan*, 905 F.3d at 1172. Here, plaintiff claims that, in retaliation for reporting the racist remarks of Ms. McAlister, Check-6 withdrew plaintiff's ability to work from home, withdrew her previously approved paid time off, and terminated her employment. [Doc. 2, p. 11 ¶¶ 79–82].

#### 1. Working from Home

In her complaint, plaintiff alleges that, in December 2011, Check-6 retaliated against her by instructing her that she could no longer work from home and would need to come to the Check-6 site Tuesday through Thursday. [Doc. 2, p. 7 ¶ 41]. However, plaintiff does not dispute that Check-6 asked all of the members of the QA team to adjust their work schedules to be in the office Tuesday through Thursday and to restrict working from home to Mondays and Fridays. [Doc. 46, p. 18 ¶ 67]. Nor does plaintiff dispute that the change to the QA schedule was intended to encourage workers to begin adjusting their schedules to use new facilities and to enable a better

---

[2] In her opposition brief, plaintiff states that she does not seek to pursue her retaliation claim under Title VII. [Doc. 48, p. 19 n.3].

17

working relationship with the newly organized QA team. [*Id.*]. Check-6 has proffered a legitimate, non-retaliatory explanation for its decision to restrict working from home, and plaintiff has identified no evidence that this explanation is pretextual.

### 2. Withdrawn PTO

Plaintiff also alleges Check-6 changed her working conditions on December 15, 2015, when Ms. Craig advised plaintiff that she would not be paid for personal time off. [Doc. 2, ¶¶ 44, 73, 81]. However, the e-mails exchanged that day between plaintiff and Ms. Craig reflect that any threat to plaintiff's PTO was the result of a misunderstanding. [Doc. 46-23, p. 2]. As plaintiff's new manager, Ms. Craig was not aware of the terms of plaintiff's contract, which were different than the terms of other contractors' contracts. [Doc. 46, p. 18 ¶ 68]. This is evident in Ms. Craig's explanation that plaintiff would not be paid for time not worked because that was the "standard practice" for contractors. [*Id.*]. Once plaintiff noted that her contract was nonstandard, Mr. Krasinski intervened in the conversation. [*Id.*]. Assuming *arguendo* that Ms. Craig's statements to plaintiff constituted an adverse action, plaintiff has failed to identify any evidence that Check-6's non-retaliatory explanation is pretextual.

### 3. Termination

The record shows that Check-6 had legitimate, non-retaliatory reasons for terminating its relationship with plaintiff. Plaintiff does not dispute that, at the time of her termination, Check-6 continued to struggle financially and plaintiff was receiving a retainer that was more than double the salary of Ms. McAlister, the QA analyst with whom plaintiff was working. While plaintiff denies that there were deficiencies in her work, there is no dispute that Ms. McAlister reported deficiencies in plaintiff's work to Ms. Craig in October 2015. Plaintiff also does not dispute that she had begun missing meetings and that she did not want to work under the company's new organizational structure. In her response brief, plaintiff's only argument is that the reasons

provided by Check-6 for terminating her are "clearly pretextual" because "no reason was provided at the time Defendant took the action." [Doc. 48, p. 24]. However, Check-6 was not obligated to provide plaintiff with a reason for terminating her, and the absence of an explanation at the time of termination does not, on its own, make the later-provided reasons pretextual. Plaintiff has failed to establish a genuine dispute of material fact as to whether the proffered reasons for her termination are pretextual. Therefore, Check-6 is entitled to summary judgment on plaintiff's retaliation claim, which fails as a matter of law.

### IV. Conclusion

WHEREFORE, defendant's Motion for Summary Judgment [Doc. 46] is granted.

IT IS SO ORDERED this 3rd day of January, 2019.

_____
GREGORY K. FRIZZELL, CHIEF JUDGE